FILED

MAR 1 0 2023

RORY L. PERRY II, CLERK
U.S. District Court
Southern District of West Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON



GUY RICHARD BUCCI and
ASHLEY NICOLE LYNCH,

     Plaintiffs,

v.                                                              Civil Action No. 2:22-cv-00604

BRIAN DOOLEY KENT,
individually,

     Defendant.

## AMENDED COMPLAINT

For their Amended Complaint against the Defendant, Plaintiffs allege and say as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1.     That the Plaintiffs Guy Richard Bucci ("Bucci") and Ashley Nicole Lynch ("Lynch") are citizens and residents of the State of West Virginia and at all times material herein practiced law in the State of West Virginia, including Kanawha County, West Virginia, which is within the Charleston Division of this Honorable Court.

2.     That the Defendant Brian Dooley Kent ("Kent") is a lawyer practicing in the City and County of Philadelphia, Commonwealth of Pennsylvania. Kent is a citizen and resident of the Commonwealth of Pennsylvania and referenced as "Defendant" or "Kent".

3.     That at all times material hereto, Defendant entered into this Joint Venture Agreement ("Joint Venture") with Plaintiffs for the representation of all former students harmed at Miracle Meadows School ("MMS") filed in the Circuit Court of Kanawha County, West Virginia, or elsewhere in the State of West Virginia, and which Joint Venture still continues as a

1

matter of law and cannot be terminated until the last of all the former MMS student cases represented by Defendant has concluded by settlement or by final judgment in cases filed in the Circuit Court of Kanawha County, West Virginia or in the State of West Virginia[1]. The Joint Venture, as mutually agreed between the parties herein, was related to all civil actions filed and to be filed by the parties herein on behalf of former students of MMS related to the Seventh Day Adventists Church ("SDAC") and Mountain View Conference ("MVC") located in Salem, West Virginia, and which will be referenced herein as Miracle Meadows School, "MMS", and/or Seventh Day Adventists Church "SDAC". There were additional parties joined as defendants, including individual defendants, some of whom participated in the settlements entered into with each individual plaintiff. Finally, there were no other Plaintiffs' counsel who were included in this Joint Venture Agreement. Defendant breached his fiduciary duty to Plaintiffs by continuing to represent the former MMS students who became Defendant's clients as a result of the Joint Venture Agreement from which Defendant unilaterally and illegally terminated Plaintiffs, and thereby excluding them from their rightful participation in these cases and attorney fees rightfully earned by them and all arising from the Joint Venture.

      4.     That jurisdiction based on diversity of citizenship is proper in this Court, pursuant to 28 USC §1332, in that Plaintiffs are citizens and residents of the State of West Virginia, and the Defendant is a citizen and resident of the Commonwealth of Pennsylvania and the amount in controversy is in excess of $75,000.00, exclusive of interests and costs.

      5.     That venue is proper in the Charleston Division of this Honorable Court in that substantial activity of the parties was directed to, occurred, and is occurring therein, and the

---

[1] Necessarily under the Joint Venture Agreement, Plaintiffs would also serve as local counsel primarily to sponsor Rule 8 *pro hac* Admission of Kent. The *pro hac* sponsorship is referenced by rule as a local counsel, even if the relationship is an agreement as it is here.

cases prosecuted or settled (or judgment entered) in the Circuit Court of Kanawha County, West

Virginia, and continue to do so as the direct result of this Joint Venture Agreement between the

parties entered into in Kanawha County, West Virginia, and which included, and still includes to

this day, the parties to the within civil action. This Joint Venture has not terminated in that the

purpose of this Joint Venture, as expressed by Kent, was to represent all former students at MMS

located in Salem, West Virginia, that were harmed by actions of the MMS as described in those

cases. The purposes of this Joint Venture continues, although Kent unilaterally and illegally

terminated Plaintiffs' interest in the Joint Venture.

<u>FACTUAL BACKGROUND</u>

THE JOINT VENTURE AGREEMENT

6.        That on or about November of 2016, Kent contacted Bucci to discuss formation of

an agreement, which then became this Joint Venture Agreement, for the joint prosecution of

former MMS students' damage actions based on allegations of grievous harms committed

against them at MMS located in Salem, West Virginia, which, as alleged, was created by the

SDAC and its MVC. The parties agreed to this Joint Venture Agreement in late 2016 and

January of 2017, for the purpose of investigation, promotion, funding, and prosecution of ALL

such cases because all such cases were linked to the clients' attendance at MMS. A joint venture

agreement is ethically and pragmatically permitted by the laws of the State of West Virginia,

West Virginia Code of Professional Responsibility, and Rules for Admission to Practice in the

State of West Virginia. Further, a contract of Joint Venture Agreement, as here, may be express

or implied, and may be oral or written. On that basis, these clients and future clients would be

represented by Defendant and Plaintiffs pursuant to their Joint Venture. The parties further

contemplated that additional counsel not part of the Joint Venture could be added as the

circumstances of the case required, and that did occur, during the prosecution and settlement of the first 29 cases. The agreement was this Joint Venture Agreement, and not a co-counsel, referral counsel or local counsel agreement (except as necessary by Rule 8 for Kent's *pro hac* and later Gaetano D'Andrea's admissions). This Joint Venture was established in large part because of the financial support and extensive legal experience provided by Plaintiffs. The Joint Venture was also established for promotion of the cases, which started with only two clients and continued to add ALL former MMS students who were harmed while attending MMS. Among other duties, Plaintiffs were responsible for identifying the wrongdoing and who was harmed by the wrongful conduct at MMS as evidenced by several government investigations. Additionally, it was agreed that Plaintiffs would take the lead in submitting Freedom of Information Act ("FOIA") requests to various government agencies and drafting, filing and service of pleadings, discovery answers and requests, securing expert witnesses, and leading motion practice and pre-trial and trial participation in prosecuting these actions in a jurisdiction which Kent admitted was foreign and unfamiliar to Kent. Kent was responsible for the promotion of these cases, considering the benefit of his national expertise in sexual abuse cases, which would assist with the national promotion of these cases. As the Joint Venture was underway, the responsibilities of Plaintiffs increased at Kent's request, but Plaintiffs successfully discharged those additional responsibilities as set forth herein. The overall success of this Joint Venture continues to this day because of the work product and financial contribution of Plaintiffs to the benefit of Defendant and to the clients of this Joint Venture, past, present and future, all as set forth herein.

7.     That several of the initial MMS student clients were referred to Kent by a lawyer colleague practicing in Portland, Oregon. The colleague informed Kent that there were dozens of other former students also harmed at MMS, so it was likely "word would spread" and there

would be many more cases.  He requested a referral fee for clients referred as later agreed to and paid by the Joint Venture.  Neither he nor anyone else outside of the parties and Kent's law firm was a member of this Joint Venture past, present, and future.

8.      That in creating the Joint Venture Agreement with Plaintiffs, Kent explained that he was in the process of securing additional client referrals from a lawyer colleague in Portland, Oregon, where the initial clients lived or had resided and he expected the number of cases to increase substantially and word to spread of the West Virginia cases. At that time, other potential clients known to or referred to Kent resided in the States of Oregon, Washington, Arizona and the District of Columbia, and other potential clients were located across multiple states.  In large part as an inducement to agree to this Joint Venture Agreement, Kent estimated to Plaintiffs that 100 or more cases for the Joint Venture would be added from the number of referrals from his Oregon colleague, inquiries by former MMS students or family members, as well as by promotion of cases directed to former students. Kent wanted to move forward quickly and recognized that venue and jurisdiction for all cases was present in West Virginia and no other jurisdiction. So, he needed the substantial presence of Plaintiffs in West Virginia to prosecute these cases because West Virginia is where the harm and damages occurred.

9.      That Kent recognized the realistic potential that the representation of his estimated 100 or more former students with meritorious individual claims in West Virginia to process and investigate as a daunting task.  He communicated that client number estimate to Plaintiffs to support his request to form and induce the Plaintiffs to join this Joint Venture Agreement, which they did, and to which Kent agreed under its terms, including an apportionment of thirty percent (30%) of any fee recovery to Plaintiffs.  Plaintiffs agreed with Kent to form a Joint Venture because the proper venue and jurisdiction for the cases would be a

5

Circuit Court in the State of West Virginia, likely Kanawha County, and the purposes of this Joint Venture would exist for all cases in West Virginia. All parties agreed that their Joint Venture would have a high likelihood of success with an active, knowledgeable, and experienced Joint Venture law partner in Charleston combined with Kent's national experience prosecuting child sexual abuse cases and with Plaintiffs providing access to needed funding for the Joint Venture case prosecution, and even for Kent's law firm as set forth herein.

10.     Kent said he reasonably believed the Joint Venture would encompass more than 100 individual cases in West Virginia.

11.     That in fact, Plaintiff Bucci is proven to be well informed and experienced with respect to counsel agreements, including lead counsel, local counsel, co-counsel, referring counsel, referred counsel and joint venture counsel. This Joint Venture Agreement was formed between Bucci and Lynch with Kent because Kent controlled his law firm in these cases. At the time of this Joint Venture Agreement, Mr. Bucci and Ms. Lynch were practicing as law firm partners, so Ms. Lynch is included within the Joint Venture Agreement and was vital to its success because of her outstanding experience and familiarity with the administrative, governmental, and judicial process in West Virginia. The parties cooperated with respect to additional client representation and identifying party defendants and proceeded with other relevant steps in preparing Complaints for filing and service of the Summons and Complaint according to West Virginia procedural and substantive law, which Kent admitted was unfamiliar to him.

11.     Kent explained to both Bucci and Lynch that because of the national scope of client locations, potential future client locations, and complexity of the case, he wanted to establish this Joint Venture, in large part, because of the need for national promotional activity to

secure all former MMS students harmed at the school, and, also, importantly, to concentrate the

cases in a single state court system in West Virginia so that cases were not scattered in multiple

jurisdictions to create the risk of conflicting laws and court decisions. Bucci and Lynch agreed

to Kent's request to establish this Joint Venture Agreement. Bucci advised and Kent relied on

that advice that the Circuit Court of Kanawha County was the proper venue and jurisdiction for

ALL such cases, present and future, and that still holds true. Further, Kent cooperated with

Plaintiffs to establish an overall strategy for these cases, including basic documents requested

and discovered by Bucci and Lynch and the pleadings and motions they filed and/or argued,

which proved successful and continues to this day. Kent further explained to Plaintiffs that this

Joint Venture would require funding for the cases and requested and confirmed that Plaintiff

Bucci could secure case funding. Bucci and Lynch, as West Virginia members who were well

known and qualified as Plaintiffs' counsel, possessed creditability to benefit cases arising from

this Joint Venture. Kent knew Bucci was as a highly regarded and successful Plaintiff attorney

in West Virginia, for at that time, nearly 50 years. Further, Kent knew Bucci had been

associated as counsel with law firms in a number of cases in which Kent was or had been a

member, and those cases were successfully prosecuted and settled. Bucci was well known to

Kent as a long-time AV rated lawyer for many decades in West Virginia, as well as former West

Virginia Justice Association President. Bucci has been practicing law in Charleston since 1970

and is recognized as a "Super Lawyer" in Plaintiffs' cases. Additionally, Bucci's practice had

included a wide range of major and complex cases which fit perfectly into Kent's goal of

managing approximately 100 cases in West Virginia. Moreover, Lynch's experience and skills

as set forth herein were a necessary part of this Joint Venture and success of the cases, as

detailed herein, and the proven track record of the Plaintiffs' work product continues to provide

the foundation for these cases. This holds true long after Kent breached his fiduciary duty to

Plaintiffs by unilaterally and illegally terminating this Joint Venture on or about January of 2021,

and thereafter excluding them from all its cases following the settlements of the first 29 cases.

12.    That because Kent had known Bucci as a lawyer for a number of years and

Bucci's success and experience, including his service as an Assistant Attorney General for the

State of West Virginia and as a Special Assistant Attorney General in consumer protection cases,

specifically antitrust and excess credit card excess charges, he requested that Bucci agree to the

Joint Venture, including Lynch as his partner.  Further, Kent knew because of his discussions

with Bucci and others that Bucci's experience and successful client representation of multiple

clients included representing clients in the Willow Island Cooling Tower collapse cases; Kaiser

Aluminum age discrimination cases and explosion cases; Green Springs creosote cases; Sago

Mine Disaster cases; Aracoma Mine Disaster cases; Upper Big Branch Mine disaster cases;

Breast Implant cases, as well as multiple catastrophic injury cases arising from product liability,

medical malpractice, and negligence actions.  That in addition, Bucci was a veteran of

approximately 100 federal and state court jury trials and many appeals in State and Federal

Court.  Finally, Bucci was well known and served in state government, protecting and governing

state investment security, supporting the West Virginia College of Law and as a member of the

Visiting Committee, and business development activities.

13.    That according to Kent, it was included in the Joint Venture Agreement that Bucci

and Lynch would work together to successfully request FOIA material and documents, as well as

other requests or information from agencies and departments of Federal, State and County

Governments, including the West Virginia Department of Health and Human Resources, West

Virginia Department of Education, Harrison County Circuit Clerk, Harrison County Prosecuting

Attorney and former Prosecuting Attorney, West Virginia Secretary of State, United States Internal Revenue Service and other state and county government departments and record locations. Submitting, enforcing or securing those requests required legal skill, knowledge, and perseverance to successfully complete. As the record shows, Bucci and Lynch were completely successful in obtaining and preserving FOIA, government and case specific discovery materials, all such documents and information which were central to the prosecution of the former MMS students' claims under this Joint Venture and formed the foundation to the prosecution of those cases, even after Kent's unilateral and illegal termination of the Joint Venture Agreement. Further, it was especially important to Kent that Lynch and Bucci would prepare, draft, file and serve pleadings, motions, opposition to motions, discovery requests and answers, and be prepared for pre-trial and trial because he often admitted he was not familiar with West Virginia practice, which he was not. The record shows that Plaintiffs were highly successful in discharging their Joint Venture responsibilities. Discovery enforcement required frequent court appearances and hearings before the Discovery Commissioner and Circuit Court. Lastly, Bucci and Lynch prepared and argued critical motions and responses related to pleadings, discovery, site inspections, and insurance coverage before the Circuit Court and Discovery Commissioner, all of which were successful and central to the success of the Joint Venture and the cases then, now, and continuing.

14.    That Kent continuously expressed his concern that he was unfamiliar with West Virginia and its judicial system, West Virginia civil procedure, pleadings, discovery and evidencing rules, as well as insurance coverage standards, and, especially, the impact of the discovery rule to toll the statute of limitations. Nor was he familiar with state agencies who had investigated and/or regulated MMS and its special parochial school exemptions. So, in forming

the Joint Venture, Kent relied on Bucci and Lynch to do the work necessary to move forward to

his strength, which he claimed were discovery depositions, and his national experience and

knowledge of child sexual abuse standards and methods of proof. Kent, therefore, agreed he

would provide client contact and basic client information because of his client referral and

contact sources to Bucci and Lynch for drafting of Complaints and Amended Complaints, as

well as to propound and answer discovery requests. In point of fact, Kent relied on the drafting

of the Complaints and Amended Complaints and discovery requests and answers to his Joint

Venture partners. The Complaints were based on research and records that Bucci and Lynch

obtained together with basic client information from Kent or his office. Even now, those

Complaints are being copied and filed in the Circuit Court of Kanawha County, essentially

verbatim, except for required differences in parties and the like, and filed in all civil actions after

the breach of fiduciary duty by Kent in unilaterally and illegally terminating the Joint Venture

Agreement with Plaintiffs. That the current or future pleadings added to initial filings will total

at least 100 civil actions, the number of cases estimated by Kent at the start of the Joint Venture

with Plaintiffs and relied on by Kent to induce Plaintiffs to enter into this Joint Venture

Agreement. Finally, even though Kent initially lacked the resources to fund the cases, their

success provided more than substantial funding for all future cases arising out of the Joint

Venture after the first 29 cases were settled.

      15.     That an essential element of the Joint Venture Agreement between Kent and

Plaintiffs was that Lynch was a highly experienced judicial law clerk for the late and universally

respected Kanawha County Circuit Judge James C. Stucky, Jr. for approximately four years.

During her judicial clerkship, she gained invaluable experience in the workings of the Circuit

Court and Clerk's office for filings, motions, hearings, scheduling and the like. Equally

important is that as a judicial law clerk, she was present in the courtroom and experienced

through testimony, offering of evidence and legal arguments concerning state and county

agencies, as well as private party issues relevant to litigation of child sexual abuse and abuse and

neglect cases. So, she was familiar with West Virginia administration of child welfare, child and

sexual abuse, and education processes and proceedings, particularly FOIA enforcement

litigation. Lynch and Bucci successfully executed all such requests and enforcement actions for

the Joint Venture providing the durable foundation for the continued successful prosecution of

all cases for former MMS students harmed at the school and their cases filed pursuant to this

Joint Venture Agreement.

      16.    That another central element of this Joint Venture Agreement was that Bucci and

Lynch, who were partners, would be supported by a highly capable legal assistant, Kimberly

Dillard, who possessed extensive experience with West Virginia Courts, especially the Kanawha

County Circuit Court, and especially with plaintiffs' cases, including complex cases, with the

established skill level to manage and organize cases with an expected 100 or more individual

plaintiffs. At that time, Kent was very satisfied with Ms. Dillard, an experienced legal assistant

to Bucci for over thirty years, with unquestioned legal experience and qualifications to serve that

function for this Joint Venture and Kent's estimated 100 or more cases.

      17.    That the goal of this Joint Venture was to ensure that MMS and the SDAC and

other defendants were held accountable for the serious harms they committed against their

former students, the number of which was undetermined at the time of the formation of the Joint

Venture but was projected to number at least one hundred, and this Joint Venture in West

Virginia was the best way, if not the only way, to serve that goal for clients and potential clients

scattered across the country.

18.     That central to Kent's formation of this Joint Venture with Bucci and Lynch was the combination of all of the factors described herein together with Kent's express statement at the formation of this Joint Venture that he estimated the cases associated with this Joint Venture arising from students harmed at MMS would total one hundred or more.  However, he was concerned that the cases would need to first survive motion practice, which would require FOIA documents and early discovery from defendants and public sources, as well as overcome other hurdles in West Virginia that are common to such cases.  Bucci and Lynch accomplished these tasks.  Accordingly, Bucci's long standing knowledge, experience, familiarity, and standing gained through half a century of practice in the West Virginia legal system and his ability to support immediate funding for the start of these cases were necessary to the success of the Joint Venture, as was the legal work product of Bucci and Lynch to oppose the MMS litigation defendants' multiple defense motions and overcome other obstacles.

19.     That Kent's Joint Venture Agreement with Bucci and Lynch was especially unique and valuable for Kent because it would allow the former MMS student cases to gain early access to highly relevant information and nationally promote additional cases to attract additional clients which, in fact, occurred because Plaintiffs provided funding and combined extensive legal expertise with many of the West Virginia government institutions, court systems, and individuals to whom inquiries would be made and information obtained.  Kent, on the other hand, neither knew nor could have known how, nor did he attempt to know such necessary information, nor was he capable of providing needed funding for these cases or his own law firm.  The result achieved by Plaintiffs would benefit Kent's promotion to nationally acquire additional cases which he has now turned into his financial benefit and from which he has unexpectedly and

surprisingly excluded Plaintiffs in breach of his fiduciary duty when he unilaterally and illegally terminated the Joint Venture and converted its assets to his sole control.

20.     Most important, as part of the Joint Venture Agreement, Plaintiff Bucci was responsible for securing case funding for the prosecution of the cases, as Kent was concerned about funding the first of the hundreds of potential cases arising out of the Joint Venture because of the high volume of cases his law firm was already funding. According to Kent, neither he nor his law firm had the ability to fund these cases when this Joint Venture was formed, nor was any other entity willing to fund these cases, and none did except for Plaintiffs. In fact, during the course of these first 29 cases, Plaintiffs practiced at a law firm for a period of time following the established and finalized Joint Venture, and the Plaintiffs' former law firm required that Plaintiff Bucci be solely responsible and personally provide all case costs for this Joint Venture.

21.     That specifically, Bucci and Lynch did not forfeit their interest in the Joint Venture by later joining a law firm where they practiced for a period of time after this Joint Venture Agreement was already established and finalized. In fact, they continued to represent other clients whose cases started with them at the firm where they previously practiced, and as with any other client they continued to represent clients after their departure from their former law firm which was not a party to said Joint Venture. Thus, had Kent not unilaterally, secretly, and illegally terminated them, the Joint Venture would have continued. In further proof that the previous law firm was not a member of the Joint Venture, it demanded that Bucci be solely responsible for the prosecution costs for all MMS cases, thereby denying any assumption of Bucci's role in the Joint Venture. And in fact, the former law firm made many efforts to terminate their interests in the cases.

13

22.     Further, as the initial cases were progressing, a major component of this Joint Venture Agreement was that Kent was concerned about his law firm's lack of financial stability at that time and his law firm would need future funding as this Joint Venture progressed. Therefore, Kent requested Bucci's assurance he would assist in funding his law office operations if and when needed.  Bucci agreed and provided that assistance in funding Kent's law firm as a part of this Joint Venture Agreement and its future success in September of 2017 because, as Kent explained, without that funding, "they couldn't keep the doors open".

23.     That on January 27, 2017, in accordance with this Joint Venture Agreement, Bucci and Lynch filed Complaint(s) acting on behalf of this Joint Venture in the Circuit Court of Kanawha County, West Virginia against MMS, Susan Gayle Clark and others, including the Mountain View Conference of the Seventh Day Adventists Church, North America Division, and the Seventh Day Adventist Church of North America.  The Complaint was filed on behalf of two former students who would be the first of at least a hundred such cases as estimated by Kent based on his considerable experience in national sexual abuse cases arising out of instructional child abuse, child sexual abuse and related wrongful acts, and conduct by defendants who had supervision and responsibility for the MMS students, and committed wrongful acts and engaged in other conduct creating liability for the harms inflicted such as occurred at MMS.

24.     Upon information and belief, Kent controlled his law firm and its decisions concerning the Joint Venture Agreement between the parties hereto, as well as the national promotion of this Joint Venture.  Most of all, he eventually controlled the unilateral and illegal termination of this Joint Venture Agreement, which he has yet to communicate to Plaintiffs, other than by his silence and elimination of Plaintiffs from all future cases following the settlement of the first 29 cases.  Kent retaliated against Bucci because of Bucci's insistence that

Kent comply with the Joint Venture Agreement, Rules governing the practice of law in West Virginia, court scheduling orders, and clients' discovery obligations. Bucci repeatedly requested that Kent follow the rules as a *pro hac* admitted lawyer as described herein, as was his responsibility to the clients, which was in turn met by hostile replies from and non-compliance by Kent, and, eventually, by retaliation from Kent through the unilateral and illegal termination of Plaintiffs from this Joint Venture, which has yet to be communicated by Kent, except by his actions in directing the exclusion of Plaintiffs from all cases beginning in January of 2021, although not informing Plaintiffs of his illegal termination.

25.     That on March 31, 2017, in further confirmation of this established Joint Venture, and in contrast to his later actions to the contrary, Kent informed defense counsel by email that, together with Guy Bucci, he would be representing plaintiffs in the MMS cases.

26.     That Kent furthered this Joint Venture Agreement by continued national promotion to obtain additional clients all scattered across the country, and to include them in the cases filed and to be filed in West Virginia and in the Circuit Court of Kanawha County, West Virginia, and all of which were concealed by Kent from the Plaintiffs following the settlement of the first 29 cases which were dismissed as settled in January of 2021.

27.     That Bucci and Lynch, and Kent as the members of this Joint Venture, agreed that individual client meetings at convenient, but distant locations, were necessary to meet and interview the clients, investigate their claims and identify and interview witnesses, some of whom were potential clients. Accordingly, beginning in October of 2017, and through April of 2018, initial client and potential client meetings were scheduled in the states of Oregon, Washington, and other locations, as well as meeting a forensic child psychiatrist practicing in San Francisco, California, and arranging for him to examine and evaluate current and future

clients of this Joint Venture Agreement. All costs were paid by the funds exclusively provided by Bucci and all were necessary to their successful Joint Venture.

28.    That it was also necessary for the parties herein to meet or confer with a number of clients and others to resolve some ancillary matters involving clients and potential clients, and that was accomplished by Plaintiffs and to the benefit and continuing benefit of this Joint Venture.

29.    That as further part of this Joint Venture, due to Kent's admitted unfamiliarity or insufficient knowledge of qualified expert witnesses in or near West Virginia who would be essential to the success of the cases, Plaintiff Bucci was responsible for identifying each specific expert witness area, including vocational impairment, psychology, school administration, and forensic economics. All of these expert witnesses made the first 29 cases and future cases of Kent's estimated 100 cases successful. Bucci, as part of the Joint Venture, was responsible to contact, inform, and update each reliable and credible expert witness, all of whom were retained and all but one of whom was disclosed as an expert. That particular expert was not disclosed only because of his tragic and untimely death from cancer. Kent then retained a replacement psychiatric expert who was a very well qualified and important expert witness in the case. Both Kent and Bucci met separately with him in San Francisco, California, where the expert lived and practiced. All such experts remain foundational to the continued success of the Joint Venture cases, even after Kent unilaterally and illegally terminated Plaintiffs from the Joint Venture Agreement without any communication in January of 2021.

30.    As the Joint Venture was progressing, in May of 2017, Kent confirmed the promotion of the Joint Venture plan with Bucci to utilize Facebook and other marketing methods to attract students across the country that were harmed at MMS as clients, as well as clients

16

harmed at its sister school, Advent Home, located in Tennessee, a party defendant in some of the
initial 29 cases filed, prosecuted and settled in the Circuit Court of Kanawha County.

31.    In furtherance of this Joint Venture Agreement with Plaintiffs, Kent directed the
national promotion of the Joint Venture concerning former MMS students harmed at MMS in
West Virginia in relying on the Abuse Guardian, his own nationally sponsored promotional
publication believed to be a primarily sponsored publication reviewed by Kent, which included
his photograph. The national publication includes specific reference for sexual abuse cases
against MMS and SDAC, and includes Bucci, Kent's Joint Venturer, by name as counsel for the
West Virginia cases.

32.    That Kent's national sponsored promotional publication explicitly and up to date
confirms the relationship with his Joint Venturer in West Virginia.  Plaintiff Guy Bucci is
identified by name as Kent's West Virginia attorney for the former MMS student cases.  Kent's
personally sponsored promotional publication, Abuse Guardian, is current to 2022, claims it is
personally reviewed by Kent, and confirms therein that Bucci is this Joint Venture's West
Virginia counsel.

33.    Subsequently, and in the course of this Joint Venture Agreement, Kent requested
that Bucci secure financing for the regular operating costs of Kent's law firm because of his
short-term cash needs, and as Kent explained, a complete and total lack of any other source of
funding so they could "keep the doors open".  Bucci agreed and Kent affirmed his commitment
to working with Bucci for all present and future Joint Venture cases.  That funding occurred in
September of 2017.  Specifically, the funding component of this Joint Venture was obtained
through Bucci by providing his assets for collateral for a proper commercial bank loan from a
West Virginia bank, and without that collateral, no proper commercial bank loan or other forms

of funding would have occurred.  In fact, according to Kent, he had no other financial sources that would agree to provide any further funding for Kent or his law firm.  All sources of funding, according to Kent had "dried up".  This law firm by Bucci funding was in addition to the Joint Venture case cost funding Bucci alone secured and which was necessary for the success of this Joint Venture.

34.    That in fact, a Joint Venture ordinarily means and includes "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects (effort), skill, and knowledge and arising out of a contractual agreement of the parties, (meaning only the parties to the within civil action) and that agreement may be oral or written, and express or implied", as was the case here, and for which there was a meeting of the minds.

35.    That a Joint Venture is likened to a partnership and confers a duty of fiduciary responsibility on its members, which Kent intentionally breached to the determent of Plaintiffs.

36.    The parties to the Joint Venture owe a fiduciary duty with respect to all members and compliance as lawyers with their responsibility and duty of completion of the agreed upon Joint Venture.  Kent, as alleged herein, breached his fiduciary duty to Plaintiffs by unilaterally, illegally, and with no communication to Plaintiffs, terminating this Joint Venture before it was completed, and while Kent continued to secretly conceal its cases and successes from Plaintiffs, yet receiving financial benefits produced to him by this Joint Venture success.

37.    That the agreed Joint Venture of the parties herein was established over the time period of late 2016 to January 2017, and by law continues to this day because Plaintiffs never agreed to its termination, nor did they terminate the Joint Venture Agreement.  Although as alleged *infra*, Kent unilaterally and illegally terminated the Joint Venture in January 2021, he did

18

so without Plaintiffs' knowledge or consent because of Kent's secrecy and concealment. Kent,
after his unilateral and illegal termination of the Joint Venture, continued the representation and
prosecution of cases of former MMS students arising out of the Joint Venture while using
Plaintiff Bucci's name in his custom brochure and continuing to promote and market former
MMS students' cases arising out of this Joint Venture.

38.     The fiduciary duty, which Kent breached, as explained herein, applied only to
Plaintiffs and Kent. Upon information and belief, Kent controlled his law firm's actions and is
therefore liable individually to Plaintiffs for compensatory and punitive damages for the payment
of attorney fees received arising out of this Joint Venture because of his unilateral and illegal, as
well as secret concealment and termination of the Joint Venture, which he never communicated
to Plaintiffs, yet continued to represent the clients and receive attorney fees arising from the Joint
Venture and to his substantial personal financial benefit.

39.     That further, this Joint Venture Agreement impressed upon all the parties a
fiduciary duty as one is found in a partnership, and it is the core of this cause of action that Kent
breached his fiduciary duty to Plaintiffs, as described herein, by his unilateral and illegal
termination of the Joint Venture Agreement and secret concealment excluding Plaintiffs from all
cases after the settlement of 29 of the 100 or more cases Kent estimated to arise from this Joint
Venture, and which estimated number of cases was an inducement to Plaintiffs to agree to the
Joint Venture.

BUCCI AND LYNCH BUILDING THE DURABLE FOUNDATION NECESSARY FOR
SUCCESS OF THE JOINT VENTURE PROSECUTION ON BEHALF OF FORMER
MIRACLE MEADOWS STUDENTS HARMED AT THE SCHOOL

40.     That FOIA and discovery documents, information and materials resulting from
Plaintiffs' hard work, as well as Bucci's financial support to the cases and to Kent's law firm,

were necessary provisions of the Joint Venture Agreement for the prosecution of all past, present and future former MMS students' cases. Plaintiffs successfully obtained the critical and necessary documents and information through requests and their enforcement, including FOIA and discovery documents and other document requests directed to agencies of the State of West Virginia, West Virginia Supreme Court Clerk's Office, and the Clerk of the Circuit Court of Harrison County, West Virginia, and other government entities. These materials, documents, and information were foundational, necessary, and highly relevant to the success, past, present and future, of the Joint Venture, even as it continues to this day.  This is true for not only the first 29 cases, but for the of 100 or more cases arising out of the Joint Venture as represented by Kent would be likely to be, and apparently are, or have been prosecuted.

41.     That these highly relevant documents included records and photographs of the inspection of MMS scheduled timely and efficiently by Bucci and Lynch to preserve evidence— specifically photographs and measurement of the quarantine rooms which were used as a form of medieval punishment for the students at MMS.  These rooms were windowless boxes, approximately 3X6 feet, with no sanitary accommodations, and with documentation, later proved to be critical evidence due to the potential for building destruction at the school because the property was later placed on the market for sale.

42.     In addition to securing documentation central to the case and preservation of evidence for the success of the cases arising out of this Joint Venture then and in the future, Plaintiffs Bucci and Lynch drafted the Complaints and Amended Complaints and took the necessary, intricate, and voluminous steps in the filing and service of the former MMS student plaintiffs' Complaints and Amended Complaints and Summons involving multiple defendants, many of whom were non-residents of the State of West Virginia but were subject to its

jurisdiction. Those non-residents raised a jurisdictional defense which Plaintiffs successfully

opposed by written and oral argument response, and in enforcing relevant jurisdictional

discovery and securing proper service of process, a difficult task. Those Complaints and

Amended Complaints are copied essentially verbatim in filing additional cases arising out of the

parties Joint Venture Agreement.

43.     That by October 13, 2017, Kent acknowledged the overwhelming and successful

work, effort and productivity by Bucci and Lynch to meet the goals of the Joint Venture for the

former MMS students' cases against MMS and other defendants, recognizing that a successful

beginning of the cases would inevitably lead to successful results. Kent so confirmed in an email

to Bucci stating "No hurry thanks literally a ton of work by you and Ashley." Essentially, this

email is an admission by Kent that Plaintiffs were already doing their share or more of the work

for the success of this Joint Venture.

44.     That in fact, the early success in motion and discovery decisions was achieved by

Bucci and Lynch themselves without significant contribution by Kent, but was of critical

importance to the cases then pending, as well as cases later arising out of this Joint Venture.

45.     That in fact, while Bucci and Lynch were building a solid foundation for the

successful prosecution of the Kent estimated 100 or more cases of former MMS students against

MMS arising out of the Joint Venture, Defendant Kent directed his efforts to promoting new

cases to add additional clients rather than grinding through the FOIA documents, pleadings,

motions, discovery documents and the like, as well as supporting the cases already filed on

behalf of the clients that he had a duty to represent. Additional clients represented by Kent after

the successful prosecution of the first 29 cases were secretly concealed from Bucci and Lynch in

breach of Kent's fiduciary duty to them and are the gist of this action because there would be no

successful future cases arising out of the Joint Venture without the many contributions by

Plaintiffs to the success of the Joint Venture.

ROAD TO SUCCESS OF THE JOINT VENTURE

46.     That as part of the Joint Venture Agreement, because of his direct client

communications, Kent promised to timely produce client discovery information and documents

for Plaintiffs herein to answer the MMS defendants' case written discovery requests.  Kent

repeatedly failed to do so in a timely matter making it difficult to meet essential deadlines

because Kent did not timely or completely perform this specific part of the Joint Venture

Agreement as promised.  So, Bucci and Lynch had to do the work to prevent Kent's inexcusable

delays from harming the clients and to make sure he was not in violation of Rules of Civil

Procedure, scheduling orders or Rule 8 of the Rules of Admission to Practice because Bucci was

responsible for Kent's actions.

47.     Kent later admitted his lack of knowledge of his own case and failure to timely

provide client information was because of his own lack of proper office efficiency and failure to

maintain his file materials provided to him by Bucci, Lynch, and Dillard, as well as by MMS

case defendants when required of them.  In short, Kent admitted he could not find the file.  So,

he relied on Bucci, Lynch, and Dillard for these documents to perform the work because he

could not fully participate without a full and complete file.  In fact, Kent and his firm at first

refused to take responsibility for failing to find the file but blamed Bucci's longtime paralegal, a

highly respected and excellent paralegal as demonstrated by her job performance over the past

thirty (30) years, for not forwarding these files to him.  That was never true or accurate and in

fact Kent was provided the entire file at all times.  Specifically, Kent pointed his finger at

Plaintiffs' paralegal, accusing her for not forwarding the file material and information, as a

dishonorable and dishonest excuse for his own lack of knowledge and accountability regarding

22

his own cases. Kent demanded Bucci immediately discharge Dillard who had done nothing wrong. And, ironically, in fact, without her services, the cases would not have survived because she complied and served all court and discovery filings, often carrying carts of boxes from the office to be mailed to the Clerk and opposing counsel.  Bucci rejected Kent's demand which would have harmed clients.

48.    By October of 2017, Kent was often non-compliant with his responsibilities under this Joint Venture and in not following the Rules as is required by Rule 8 of the Rules for Admission to Practice, including responsibilities in the filed cases which is evidenced by numerous telephone calls, telephonic and personal meetings with Bucci and by email exchanges. This was a cause for concern to Plaintiffs, essentially because Kent had already publicly characterized his own clients in the national news media as "at-risk youth with a history of disobedience" and within his own promotional publication as minors with "a history of disobedience and misconduct . . . .diagnosed with behavioral conditions [including] oppositional defiant disorder"; even going as far to say in the promotional material that "Some [children] chose the school to avoid lengthy prison sentences." All of this was prejudicial to the credibility of the clients and their cases because Kent, by his own words, made his clients appear as non-compliant with their responsibilities in the cases of this Joint Venture, and, thus, vulnerable to discovery sanctions or worse.

49.    Specifically, during that time period, Plaintiff Bucci had concerns with Kent not following the Rules, Bucci's responsibility for Kent as a *pro hac* admitted lawyer, and whether the MMS case defendants would attempt to disqualify Kent because of his delaying work product necessary to answer discovery, as well as specifically not complying generally with the West Virginia Rules of Civil Procedure, the Court's Scheduling Order and Rule 8 of the Rules of

Admission to Practice. Also, clients were scattered throughout the country making communications decentralized and difficult unless dedicated action occurred, as it did later in the case when Attorney Gaetano D'Andrea, a lawyer practicing with Kent's firm, entered his appearance in the case pursuant to a *pro hac* motion in April of 2018. Plaintiffs were concerned that not only was Kent placing their clients at risk of sanctions or worse, but that he would also diminish the opportunity to add additional clients who he had previously described as "disobedient". More of a concern was the possibility of successful defense motions to dismiss, and discovery enforcement motion as well as jurisdictional motions in those cases, because Kent himself did not contribute as he had agreed to assist with discovery and responses in opposition to those motions, as was his obligation to the clients especially because he always represented his superior experience in child sexual abuse cases.

50.    That in fact, Bucci, Lynch and Dillard made extraordinary efforts to keep Kent in compliance with Rule 8 of the Rules for Admission to Practice and with other scheduling requests so that no violation actually occurred, and because of their collective great dedication to the clients, the Joint Venture cases were successful. Plaintiffs did so to protect the interests of the clients because Kent's recognized national level of skill in cases of child sexual abuse was expected to finally contribute to the success of these cases. It is believed that this exercise in internal professional discipline by Bucci directed to Kent explains the basis for Kent to unilaterally and illegally terminate this Joint Venture Agreement in retaliation for being held accountable to comply with the Rules in West Virginia.

51.    Kent's national activity in promoting his interest to represent clients in child sexual abuse, SDAC cases generally, and MMS cases specifically, rather than engage in dedication to the prosecution of the filed, and to be filed, MMS cases in West Virginia, as was

his duty to his clients under Rule 8, prevented him from knowing much about the cases, except the information Plaintiffs provided him or discovery produced by the MMS case defendants. This failure prevented him from making the level of substantive contributions he promised and was required of him for the early success of the cases for which Bucci and Lynch were responsible until April of 2018, as described herein, when Gaetano D'Andrea appeared in the cases pursuant to the *pro hac* motion by Bucci.

52.     That following Plaintiff Bucci's continuous concerns for Kent's rules and schedule non-compliance as a *pro hac* admitted attorney under Rule 8 of the Admission to Practice, in approximately April of 2018, Kent finally recognized that he needed to become much more involved in the cases arising under the Joint Venture Agreement and in representing the clients, so he employed Gaetano D'Andrea. This was especially necessary for soon to occur meetings with and preparing clients for depositions and depositions of defendants and other witnesses, as well as expert witness inclusion for discovery preparation. Therefore, as referenced above, in April of 2018 under the *pro hac* motion, a newly hired associate in Kent's law firm entered his appearance in the consolidated cases pending in the Circuit Court of Kanawha County. D'Andrea thereafter dedicated himself to the representation of the clients, and the first 29 consolidated cases steadily advanced to a successful conclusion by cooperative work with the Plaintiffs under this Joint Venture Agreement.

53.     Plaintiffs worked on the first group of consolidated cases until the very end of the settlement of the first 29 cases, more than fully contributing their share of the Joint Venture, including solely securing the Joint Venture's funding, as well as the funding for Kent's law firm. Additionally, Plaintiffs worked tirelessly to follow the rules to keep Kent from violations of Rule 8, scheduling orders, and timely court filings. In fact, Kent has never communicated to Plaintiffs

that there was a termination in this Joint Venture Agreement, Kent simply unilaterally and illegally terminated, as a matter of his convenience, the Joint Venture after its first fruits of success, by excluding Plaintiffs from all additional cases, but never informing Plaintiffs he had done so, and in fact, concealed those cases from the Plaintiffs. Plaintiffs' expertise and work product was sought at all times throughout the cases in all areas by all counsel, including by Kent, and also frequently, if not daily, by D'Andrea. Plaintiffs fully participated and worked on all phases of the case and had they not, the *pro hac* admissions of Kent would have been withdrawn by Bucci or revoked by the Circuit Court.

That in fact, Plaintiffs involvement in the case, as known by Kent, spanning the time periods both before and after D'Andrea's *pro hac* appearance in each of the following particulars as the cases progressed to trial, although not necessarily in this order, included as follows:

- Continued successful motion practice and successful discovery answers and discovery enforcement;

- Successful opposition to motions by MMS insurance carrier and the insurance carrier for related defendants for intervention in the underlying civil action of their newly filed Declaratory Judgment coverage action seeking limitation or denial of coverage;

- Successful defense of coverage action and cooperation with outside coverage counsel to successfully oppose the coverage limitation or denial declaratory judgment action;

- Continued meetings and discussions with counsel, exchange of information and preparation for discovery and expert witnesses whom Bucci located and retained, especially in areas of education standards, vocational loss, psychology, and forensic economics, as well as approving the psychiatric reports. In fact, Bucci was the primary lead counsel for all those experts throughout the case and to the point of settlement, although D'Andrea was the lead with the psychiatric expert witness located in San Francisco;

- Regular, and even daily, in person and telephone conferences with Mr. D'Andrea and other counsel to prepare them for discovery, motions, responses, depositions and to confirm necessary documents for

depositions and client meetings as well as telephonic deposition appearances, especially related to Ms. Lynch providing important documents with which Mr. D'Andrea was not yet familiar; focus group formation; scheduling and participation; meeting clients in Charleston; and attending depositions;

- Bucci, working with Lynch, discovered Internal Revenue Service documents critical to liability claims of MMS students against defendants;

- Bucci mentored, monitored, and remained informed about all cases, and, in fact, without Bucci's continuous contributions and copious information from Lynch in familiarizing D'Andrea with discovery and documents for the depositions, the cases would not have been successful;

- Bucci and Lynch worked closely with Kent, D'Andrea and other lawyers to schedule and attend the mediations and identify the mediator and the replacement mediator; contribute to preparing the mediation presentations and video; attend and participate in the mediation sessions and negotiate the settlement; and review and edit necessary settlement documents;

- Bucci and Lynch participated in the preparation with outside counsel of trust instruments to protect the plaintiffs recoveries; and

- Continued funding for the Joint Venture Agreement cases.

54.     During the prosecution of the Joint Venture cases, additional attorneys became involved for various purposes and upon information and belief, continue to be involved with the cases arising from this Joint Venture, and they were never part of or included in this Joint Venture formed by the parties herein.

55.     During the prosecution of the cases and in furtherance of this Joint Venture, the continued contributions of Bucci and Lynch to the highly successful settlement agreement of the initial 29 cases was frequently recognized and appreciated by D'Andrea.  In fact, on Thanksgiving Day 2020, D'Andrea texted Bucci dated November 26, 2020 at 9:19 a.m., as follows:

Hi Guy, on a day where we say what we are grateful and thankful for I want to let you know that I am incredibly thankful that I had the opportunity to work with you.  You were and are a mentor to me.  I appreciate all of our work and time

27

> together.  I am happy we were able to achieve such a great result but I am even
> happier that I have you to call a friend!  Happy Thanksgiving

To which Bucci replied, not knowing and not informed by Kent of his secret plan of concealment

to unilaterally and illegally terminate Plaintiffs from the Joint Venture:

> Your thoughtful words but more important your dedicated action are deeply
> appreciated.  Enjoy your day and your family dinner

56.     That in fact, as part of Bucci's participation in this Joint Venture, at the successful

conclusion of the settlement of what are now known as the first 29 filed cases, he participated

with Kent as a member of this Joint Venture in Kent's decision to make D'Andrea a partner in

the law firm, as well as the decisional process for approving the extraordinary bonus paid to

Gaetano D'Andrea for his excellent work on the case.

### THE CONCEALMENT

57.     That after the first 29 filed Joint Venture cases achieved a successful settlement

result and the recovery was distributed to or on behalf of clients, as well as fees and costs paid,

Bucci and Lynch were never informed by Kent to whom he owed the fiduciary duty, that in

January of 2021, and thereafter, Defendants were marketing, promoting, and signing contracts of

representation with new clients and filing additional former MMS student cases, all arising out of

this Joint Venture Agreement.  In fact, Complaints were filed alleging identical causes of action

copying the wording of the Complaints and Amended Complaints drafted by Bucci and Lynch,

with the exception of naming different parties and dates of attendance and events harming those

former MMS student plaintiffs.  They were filed and served by other lawyers who received the

benefit of the Joint Venture foundation secured by Plaintiffs through funding, FOIA documents,

discovery documents, inspection and quarantine room photographs, court rulings and the like,

yet Bucci and Lynch were never informed by Kent or anyone else, nor appeared in the additional

cases, because they were unaware of their existence. These Plaintiffs were silently terminated and excluded from this Joint Venture, unilaterally and illegally by Kent.

58.    Specifically, the FOIA documents, discovery documents, inspection photographs and materials, and the law of the case as established in the legal arguments presented by Plaintiffs herein and decided by the Court all formed a solid foundation for the additional former MMS student cases that Kent and others are filing and ALL arising out of this Joint Venture Agreement.

59.    That the breach of fiduciary duty by Kent was especially surprising to Plaintiffs because after the successful conclusion of the first 29 cases, Plaintiff Bucci proposed a pod cast presentation seminar in January of 2021 that would center on and help promote future child sexual abuse MMS cases. The seminar proposal was met with little to no interest by Kent and D'Andrea. Plaintiffs relied on Defendant to continue his promotion of the cases, since that was his role in the Joint Venture. In fact, Plaintiffs were never informed by their Joint Venture partner Kent nor anyone else, though Plaintiff Bucci was in regular communication with a member of Kent's law firm, that Kent and others were moving forward secretly and concealing the promotion, filing, prosecution, and settlements from the Plaintiffs, all while relying on financial support documents and other critical discovery obtained by Plaintiffs' work product referenced herein on their case and belonging to the Joint Venture. Under the Joint Venture Agreement, Defendant was required to include Plaintiffs in all cases and to be paid attorney fees of thirty percent (30%) of all recoveries in West Virginia because all additional former MMS student cases filed by Kent arose from this Joint Venture Agreement[2]. The Joint Venture Agreement was not a case referral arrangement, and one of its primary functions was promotion

---

[2] That while at the other firm as part of their employment agreement discussions Plaintiff agreed, as with other cases, but not as a member of the Joint Venture for that firm to receive the fees recovered before distribution.

29

to acquire additional clients not yet represented. The Joint Venture was established by Bucci's ability to provide funding, was promoted by that funding, and the continued success was secured by the early success of the cases achieved by Bucci and Lynch. Kent is contractually obligated to pay Plaintiffs their share of the fee.

60.    That Kent, in violation of his fiduciary duty to Plaintiffs, and without notice, oral or written, nor necessary agreement of Plaintiffs herein, secretly, unilaterally and illegally terminated this Joint Venture Agreement on about January of 2021, and, apparently just as secretly (without ever informing Plaintiffs), concealed from Plaintiffs he had reached agreement to prosecute additional cases with other lawyers or other law firms who were not included as members of this Joint Venture Agreement with Plaintiffs. Kent further violated his fiduciary duty to Plaintiffs by promoting, representing, and prosecuting cases for additional former MMS students in newly filed civil actions while secretly concealing all such actions from Plaintiffs in an obvious unilateral and illegal violation of Kent's fiduciary duty to Plaintiffs for their earned share of the profits or attorney fees to which Kent agreed within the terms of their Joint Venture Agreement were to be paid to Bucci and Lynch.

61.    Upon information and belief, Plaintiffs represent that Kent directed his partners and all co-counsel, altogether numbering approximately ten lawyers, to maintain complete secrecy and concealment of all such activities related to former MMS student cases from Plaintiffs in an intentional and direct violation of his fiduciary duty to Plaintiffs. As Winston Churchill once said, "A small lie needs a bodyguard of bigger lies to protect it". That statement applies to Kent's actions here, as he constructed an elaborate scheme to conceal all these cases arising and continuing to arise from this Joint Venture, from Plaintiffs in breach of his fiduciary duty to Plaintiffs.

62.     That in fact, upon information and belief, these former MMS student cases filed after the first 29 cases settled in late 2020 were concealed from Plaintiffs, despite Plaintiffs' former law firm continuing to work on the cases with Defendant, a law firm Plaintiffs joined only after the Joint Venture was established and finalized, as evidenced by said law firm's demand that Plaintiff Bucci be held personally responsible for all case costs of the first 29 cases. No one from Kent's law firm nor Kent to this date ever informed Plaintiffs that the additional MMS case filings arising from the Joint Venture between Plaintiffs and Kent were continuing in secret and concealed from Plaintiffs.

63.     That in fact, Kent so secretly and effectively successfully concealed these cases, it was not until a July 2022 Charleston Gazette Mail newspaper article that Bucci and Lynch were fully informed of the number of additional cases being filed and prosecuted arising from their MMS Joint Venture with Defendants.  Plaintiffs also learned from another lawyer of the bringing of even more cases for which he had associated with Kent.  Because of Defendant's massive continuing and intentional secret concealment, Plaintiffs are unaware of the exact number of clients and cases, but as a matter of public record, the first 29 cases settled, and there appear to be approximately 70 cases or more clients represented by Kent and others with whom Kent is now associated.  Obviously, the work of Bucci and Lynch and the funding secured by Bucci was the rising tide that lifted all boats for the former MMS students' cases and continues to do so.

64.     That in fact, Kent never informed Plaintiffs that he had terminated the Joint Venture Agreement, he simply proceeded, at least until the summer of 2022, to promote Miracle Meadows cases of former students in West Virginia in *inter alia* his ABUSE GUARDIAN national brochure, that includes reference to Guy Bucci as West Virginia counsel with Kent's

law firm, promoting and prosecuting former MMS student cases.  So, Kent, therefore, admits this Joint Venture was not terminated or ended, just that he excluded Bucci and Lynch.

65.     That in fact, in Kent's own words, in his ABUSE GUARDIAN brochure which references Guy Bucci, Kent states: "Our alliance has over 15 sexual abuse lawyers nationwide dedicated to helping survivors get justice." Brian Kent, Esq.  The term alliance is defined as "a group of…people who have agreed to work together because of shared interests and aims",  the very definition of a joint venture.

66.     That Plaintiffs do not believe it is in the best interests of the clients of the Joint Venture to expose events or attract publicity that could be adverse to clients, so their only remedy would be the within action which requires discretion in its filing under seal to protect the interests of clients, but Plaintiffs' rights are not forfeited by the illegal actions of Kent which are the gist of this action.

## COUNT I

### BREACH OF FIDUCIARY DUTY BY KENT

67.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 67, as though set forth herein.

68.     As joint venturers, Kent owes fiduciary duties of care, loyalty, and good faith as to the operations and affair of the Joint Venture to Plaintiffs, and all of which Kent breached. Kent's fiduciary duties also include obligations to exercise good legal judgment, act prudently in the operation of the Joint Venture, discharge their actions in good faith, act in the best interests of and with a fiduciary duty to the Joint Venture, its parties, and the Plaintiffs, all of which Kent repeatedly violated.

69.    That Kent had a fiduciary duty to Bucci and Lynch not to act unilaterally to dissolve, terminate, transfer, substitute or otherwise replace them in future filed cases arising out of the Joint Venture with other lawyers for the former MMS student cases arising out of the Joint Venture. Kent breached his fiduciary duty by use of such tactics as secretly concealing all additional cases filed after the settlement of the first 29 cases from the Plaintiffs, and denying them all access to the cases, participation in the cases, and recovery of their rightful fee from the Joint Venture's success and expected continued success.

70.    That Plaintiffs, as joint venturers with Kent, do not forfeit their interest in joint property assets or fees acquired in whole or in part because of Kent's retaliation against Bucci, as well as his unilateral and illegal termination of this Joint Venture, which prevented Bucci and Lynch from participation in ALL the cases arising from this Joint Venture filed by Defendant in West Virginia.

71.    The present and continued work on the MMS cases by Plaintiffs' former firm was secretly concealed from Bucci and Lynch, which can only be believed to have occurred at the direction of Kent to avoid financial obligation to Plaintiffs herein under the Joint Venture. The foundation that Bucci and Lynch had built resulted in the success of all future cases to this very day and they have earned their economic interest in fees paid and to be paid for cases arising out of this successful Joint Venture.  Finally, because Plaintiffs were so terminally excluded from the prosecution of the additional cases, Plaintiffs, acting ethically, did not want to disrespect the prosecution of those cases by prematurely creating a litigation side show that would harm the clients.

72.    Plaintiffs are entitled to an award of compensatory and punitive damages against Kent for the breach of his fiduciary duties, especially for the breach of fiduciary duty in violation

of the Joint Venture Agreement that Kent unilaterally and illegally terminated Plaintiffs' interest in the Joint Venture with Defendant Kent.

COUNT II

UNJUST ENRICHMENT

73.    Plaintiffs incorporate herein as if set forth verbatim paragraphs 1 – 72 inclusive of the within Amended Complaint.

75.    That the cause of action for unjust enrichment exists if the defendant denies the existence of an express contract alleged by a plaintiff.

75.    However, under West Virginia law, "[i]f benefits have been received and retained under such circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefore, the law requires the party receiving benefits to pay their reasonable value. *Copley v. Mingo Co. Bd. Of Ed.*, 466 S.E.2d 139 (W.Va. 1994)

76.    Further, it is proper to allege an unjust enrichment claim in the face of an express contract because it is quasi contractual.

77.    That accordingly Plaintiffs plead in the alternative that Kent was unjustly enriched by the actions of Bucci and Lynch as alleged in Count I herein and specifically with respect to the following benefits he received as a result of the work efforts and support of Bucci and Lynch as well as a highly significant attorney fee:

a.    Financing for Kent's law firm because he had no other credit sources available to him;

b.    Financing secured by Bucci for the MMS case costs:  Kent, nor any other lawyer appearing in these cases, contributed any money or any source of money to case costs, so Bucci was the only lawyer representing the plaintiffs to secure funding

34

for the investigation and prosecution, which was the key to success of the cases. But for the case cost funding provided by Bucci, these cases would not have been successful, nor would as many former MMS students have been able to bring their claims with Kent as their lawyer because he could not satisfy the first basic rule of representing plaintiffs and that is to have the capacity to fund the cases, and that funding was secured only by Bucci;

c.    That Bucci and Lynch conducted a complete, thorough and comprehensive investigation of local media, local prosecutors and local law enforcement in Harrison County and other areas nearby MMS to develop the factual basis for these claims;

d.    That Bucci and Lynch arranged for and noticed multiple site inspections, including the inspection of the quarantine rooms which were important to the evidence of abuse;

e.    Bucci and Lynch conducted complete, thorough, and comprehensive FOIA requests and other available means to request and receive, and, at times, enforce document requests to county, state and federal government agencies concerning MMS;

f.    Bucci and Lynch drafted and filed complaints and other pleadings and motions, responses or replies and memoranda, as well as discovery requirements which are essentially unchanged in the cases and later filed after Kent unilaterally and illegally terminated Plaintiffs from their Joint Venture, thereby excluding them from rightful participation in these cases and the attorney fees rightfully earned or alternatively providing for the unjust enrichment of Kent from the benefits derived from Bucci and Lynch, resulting in damages to Bucci and Lynch;

g.    As with the Complaints, other pleadings and motions, Bucci and Lynch drafted, secured and enforced, including court hearings and hearings before the Discovery Commissioner for the MMS cases, Bucci and Lynch provided successful representation;

h.    Bucci and Lynch successfully defeated attempts by defendants to oppose discovery, to dismiss the Complaints, and for lack of jurisdiction;

i.    Bucci and Lynch were also successful in opposing the MMS liability insurance carrier declaratory judgment action, as well as successfully objecting to the carrier's motion to intervene in the underlying civil actions;

j.    Bucci and Lynch successfully identified, retained, provided discovery and other materials, as well as met with all expert witnesses and produced their expert witness disclosures or reports in highly relevant areas of psychiatry, psychology, vocational impairment, educational standards, and forensic economics with the exception of the initial psychiatric expert witness which withdrew because of terminal illness. Bucci then met with the successor expert in person in San Francisco and continued to work with Mr. D'Andrea in providing information to and securing expert witness reports from the new psychiatric expert; and

k.      That the contribution by Bucci and Lynch to the success of the cases exceeded by a wide range the scope of their Joint Venture responsibilities and that necessitated by Kent's default of his responsibilities and for which he is now unjustly enriched from the benefits, especially attorney fees provided by Bucci and Lynch[3].

78.     That based on the foregoing, Kent was unjustly enriched in an amount to be determined from the recovery on each and every MMS case after the settlement of the first 29 cases and in amount to be determined based on the thirty percent (30%) of the fee he agreed to pay the Plaintiffs.

COUNT III

ACCOUNTING AND COMPENSATORY DAMAGES

79.     Defendant Kent must provide a complete accounting of all settlements, recoveries and fees from any former MMS student civil action filed or any recovery for former MMS student clients after January 1, 2021.  Further, Plaintiffs demand judgment against Kent for compensatory damages of thirty percent of the total fee paid and arising out of the Joint Venture which Kent unilaterally and illegally terminated, even though he had no lawful right or authority to do so, and because the fees are specific to the success of the Joint Venture.

COUNT IV

PUNITIVE DAMAGES

80.     Plaintiffs restate and incorporate by reference the allegations contained hereinabove in each and every paragraph as if set forth verbatim.

81.     Defendant Kent acted toward the Plaintiffs with a conscious, reckless and outrageous indifference of the rights of the Plaintiffs such that a jury would be justified in

---

[3] In fact, Bucci is still identified by Kent in promotional publication as the West Virginia lawyer for MMS cases.

awarding punitive damages pursuant to West Virginia Code § 55-7-29 in an amount of four

times the recovery of compensatory damages.

WHEREFORE, Plaintiffs demand judgment against Defendant Kent for all compensatory

and punitive damages as described herein permitted by the laws of the State of West Virginia.

**A TRIAL BY JURY IS DEMANDED**.

GUY BUCCI
and ASHLEY LYNCH,
By Counsel,

Ronald N. Walters, Jr., Esquire (WVSB #13736)
Walters Law Firm
16 Capitol Street
Charleston, WV 25301
(304) 391-8002

Guy R. Bucci, Esquire (WVSB #0521)
Ashley N. Lynch, Esquire (WVSB #11714)
108 ½ Capitol Street
Suite 200
Charleston, WV 25301
(304) 550-5660